**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Ryan D. Sam
Sam IP Legal Solutions, P.C.
6767 South Spruce Street, Suite 140
Centennial, CO 80112
Phone: 720-965-3896
Email: rsam@samiplegalsolutions.com
Atty. Reg. #: 55650

*Attorney for the Plaintiff*

| | | |
|---|---|---|
| REX ENVIRONMENTAL LLC | ) | |
| | ) | |
| Plaintiff, | ) | **CIVIL ACTION FILE NO.:** |
| | ) | |
| v. | ) | 1:26-cv-5987 |
| | ) | |
| VIGILANT MULTIFAMILY LLC and JORGE OQUELI, an individual, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AND JURY DEMAND

Plaintiff, Rex Environmental LLC, by and through its undersigned counsel, complains against Defendants, Vigilant Multifamily LLC and Jorge Oqueli, for damages and injunctive relief arising from Defendants' unlawful behavior including Defendants' counterfeit use of Rex Environmental LLC's Logo covered in United States Trademark Registration No. 7,066,427, Defendants' unauthorized use of the Rex Environmental name, and Defendants' delivery to a consumer of a fabricated mold analysis report falsely represented as having been prepared, analyzed, and approved by Rex Environmental.

## PARTIES, JURISDICTION, AND VENUE

1. The Plaintiff, Rex Environmental LLC, is a Colorado limited liability company with a principal office street address and principal office mailing address at 4760 Oakland St. Ste 100, Denver, CO 80239.

2. The Defendant, Vigilant Multifamily LLC, is a Colorado limited liability company with a principal office street address and a principal office mailing address at 5399 Federal Blvd., Denver, CO 80221.

3. The Defendant, Jorge Oqueli, is an individual who, upon information and belief, resides at 2300 Kingston St., Aurora, CO 80010.

4. This is a civil action for trademark counterfeiting under section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), and for false association and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A). This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1338(a). Defendants' acts giving rise to the Lanham Act claims also give rise to a claim under the Colorado Consumer Protection Act, C.R.S. § 6-1-101, et seq., over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because that claim is so related to the federal claims that it forms part of the same case or controversy.

5. Venue is proper under 28 U.S.C. § 1391(b).

6. This Court has jurisdiction over Defendants as Defendants are residents of Colorado and have regularly engaged in substantial, continuous, and systematic activities in this State and District and purposefully availed themselves of the privilege of conducting business in this District.

## <u>GENERAL ALLEGATIONS</u>

7. Plaintiff Rex Environmental LLC was formed on August 24, 2017, and began doing business in Colorado shortly thereafter.

8. Around September 1, 2017, Plaintiff began using its logo, (the "Logo") in association with environmental testing services, including collecting samples, engaging accredited laboratories for analysis, interpreting results, and consultations, shown as follows:

REX
ENVIRONMENTAL

9. The Logo contains a tyrannosaurus rex design, a circular design, the term REX, and the term Environmental.

10. On April 12, 2022, Plaintiff filed a United States Trademark Application for its Logo as used in connection with "Environmental testing services, namely, mold, asbestos, and lead testing and consulting related thereto" with the United States Patent and Trademark Office.

11. On May 30, 2023, the United States Patent and Trademark Office granted Plaintiff's application as United States Trademark Registration No. 7,066,427, with the term "ENVIRONMENTAL" disclaimed, as shown in Exhibit 1. Plaintiff is, and at all relevant times has been, the owner of record of the Registration.

12. The Registration constitutes prima facie evidence of the validity of the Logo as a service mark, Plaintiff's ownership of the Logo, and Plaintiff's exclusive right to use the Logo in commerce in connection with the services identified therein. 15 U.S.C. § 1057(b).

13. No color was claimed as part of the Registration and therefore the Registration covers the mark in all color variations.

14. Currently, Rex Environmental prominently uses the red and black design shown in connection with the Logo above.

15. Plaintiff has continuously and prominently used its Logo in commerce since its adoption on September 1, 2017.

16. Plaintiff has built substantial good will and recognition in Colorado among property owners, general contractors, construction professionals, and the public in general.

17. Plaintiff has a 5.0 star rating on Google with 689 reviews as of November 10, 2026.

18. According to the Colorado Secretary of State, Defendant Vigilant Multifamily LLC ("Vigilant") formed as a business entity on May 20, 2026.

19. According to Vigilant's website, Vigilant's services include mitigation and restoration services, general contracting services, investigation and consulting services, among other services.

20. On June 15, 2026, Homeowner A and Homeowner B (collectively, the "Homeowners") having a residence in Aurora, Arapahoe County, Colorado, began a project to renovate their bathrooms through a Colorado-based remodeling contractor (the "Third-Party Contractor").

21. On June 20, 2026, Homeowner A discovered a leak in the kitchen ceiling while the home was unattended, shut off the water to stop the leak, and then notified the Third-Party Contractor.

22. The Homeowners expressed to the Third-Party Contractor that they were concerned about mold developing in the kitchen ceiling because of the leak.

23. The Third-Party Contractor assured the Homeowners that he would address their concerns about mold and sent Defendant Mr. Jorge Oqueli, who upon information and belief was then employed by Vigilant Multifamily, to the residence on July 9, 2026 to assess the work and damage.

24. Upon information and belief, at all times relevant to the facts alleged in this Complaint, Mr. Oqueli was an employee or agent of Vigilant Multifamily, acting within the course and scope

of his employment or agency and in furtherance of Vigilant Multifamily's business. As such, Vigilant Multifamily is vicariously liable for Mr. Oqueli's acts as alleged herein. Vigilant Multifamily has declined to produce any documentation of the date or fact of Mr. Oqueli's separation from employment.

25. In the alternative, and to the extent Mr. Oqueli was not an employee or actual agent of Vigilant Multifamily at the time of the acts alleged herein, Mr. Oqueli acted with the apparent authority of Vigilant Multifamily.

26. Vigilant Multifamily held Mr. Oqueli out as its representative by, among other things, providing and maintaining for his use an active electronic mail account on Vigilant Multifamily's internet domain, vigilantmf.com; permitting him to send correspondence concerning the Homeowners' project from that account bearing Vigilant Multifamily's name, logo, job title, telephone number, and website address; permitting him to identify himself to the Homeowners as a representative of Vigilant Multifamily; and permitting the Report to be issued stating "Collected By Vigilant Multifamily LLC." At no time did Vigilant Multifamily advise the Homeowners that Mr. Oqueli lacked authority to act on its behalf.

27. The Homeowners reasonably relied upon Vigilant Multifamily's manifestations of Mr. Oqueli's authority in permitting Mr. Oqueli to collect samples from their residence, in accepting the Report from him, and in acting upon the Report. Vigilant Multifamily is therefore bound by, and liable for, Mr. Oqueli's acts as alleged herein.

28. On July 15, 2026, Mr. Oqueli returned to the home and took three samples of sheetrock from the kitchen ceiling and told the Homeowners that he was sending the samples to Rex Environmental for testing.

29. On Monday, July 20, 2026, Mr. Oqueli texted Homeowner B stating: "Just reached out to Rex Environmental waiting to hear back on the test[.]"

30. On Wednesday July 22, 2026, Mr. Oqueli texted Homeowner B stating: "Just got the inspection report. No mold[.] Emailing it to . . . you once i get back to the office."

31. Later that day, instead of emailing the report, Mr. Oqueli texted Homeowner B asking "Would it be OK if I drop off the report to you today here in the next 35 minutes?"

32. Homeowner B responded asking: "Jorge are you able to just email it?"

33. Mr. Oqueli responded stating: "Yes I can[.]"

34. Mr. Oqueli had been corresponding with the Homeowners via email throughout the project, including a July 13, 2026 email from jorge@vigilantmf.com and a July 24, 2026 email from jorge@savvymf.com with the email jorge@vigilantmf.com as one of the recipients. The domain name vigilantmf.com is Defendant Vigilant's domain name. The July 13, 2026 message sent from jorge@vigilantmf.com bears a signature block directing recipients to the LinkedIn page of Savvy Multifamily LLC, and outbound electronic mail from both the vigilantmf.com domain and the savvy mf.com domain is transmitted through the same electronic mail service provider.

35. On Monday, July 13, 2026, Mr. Oqueli sent an electronic mail message to Homeowner B from the address jorge@vigilantmf.com, bearing the subject line "Tomorrow's Plan" and setting out the plan for the following day's work at the residence.

36. Among the tasks Mr. Oqueli listed for the following day was to "[t]ake a sample for the mold inspection."

37. Mr. Oqueli did not collect the samples on July 14, 2026. As alleged above, Mr. Oqueli collected the samples from the residence on July 15, 2026.

38. The July 13, 2026 message bears a signature block identifying Mr. Oqueli by the titles "BDR" and "Estimator," and listing a telephone number, the electronic mail address jorge@vigilantmf.com, and the website www.vigilantmultifamily.com. The message also displays Vigilant Multifamily's logo and the designation "VIGILANT MULTIFAMILY."

39. The signature block of the July 13, 2026 message further directs recipients to a LinkedIn page located at linkedin.com/company/savvy-multifamily.

40. On Thursday July 23, 2026, Homeowner B, not receiving the report, texted Mr. Oqueli: "Good morning. I did not see the report in my email."

41. Mr. Oqueli responded stating "I got the hardcopy. Gotta scan it and send it over."

42. Homeowner B then responded stating: "Thank you! We appreciate you emailing it."

43. However, despite these requests, the report was never emailed and Mr. Oqueli stopped by the residence in the evening of July 23, 2026 and handed the Homeowners a hard copy report (the "Report") he claimed was from Rex Environmental. *See* Exhibit 2.

44. The Report has a logo centered on the top, in red and black, which reproduces the tyrannosaurus rex design, the circular design, and the term REX, and is substantially indistinguishable from the Logo shown in United States Trademark Registration No. 7,066,427. *Id.*

45. The Report states that it is a "Mold Analysis Report".

46. The Report states: "Laboratory: REX Environmental".

47. The Report states: "Report #: REX-26-0718-1045".

48. The Report states: "Sample Received: 07/17/2026".

49. The Report states: "Date Reported: 07/21/2026".

50. The Report states: "Laboratory Accreditation: ISO/IEC 17025 Accredited Environmental Microbiology Laboratory".

51. The Report states: "Collected By Vigilant Multifamily LLC".

52. The Report states: "Collection Date 07/17/2026".

53. The Report states: "Received By REX Environmental".

54. The Report states: "Condition Upon Receipt Sealed and Intact".

55. The Report states: "Material Bulk drywall (4 x 4 in.)".

56. The Report states: "Analysis Requested Direct Microscopic Mold Examination".

57. The Report gives the following results chart:

| Mold Type | Result | Quantity |
|---|---|---|
| Aspergillus/Penicillium | Not Detected | None Observed |
| Cladosporium | Trace | Rare |
| Chaetomium | Not Detected | None Observed |
| Stachybotrys | Not Detected | None Observed |
| Alternaria | Not Detected | None Observed |
| Hyphal Fragments | Rare | Minimal |

58. The Report states a "Laboratory Interpretation" as: "No significant fungal growth was identified. Trace Cladosporium spores were observed, consistent with normal environmental background levels. No Stachybotrys, Chaetomium, or other water-damage indicator fungi were identified in the material examined."

59. Underneath this "Laboratory Interpretation", the Report has the wording: "Analyst Initials: MJS".

60. The Report ends with a "Report Approval" showing "Approved By:" followed by a signature above the name "Martin Jimenez Santiago" and credential "Environmental Analyst".

61. Rex Environmental does not know who Martin Jimenez Santiago is and such a person never worked for Rex Environmental.

62. Rex Environmental is not an environmental testing lab itself and does not carry the ISO/IEC 17025 laboratory accreditation.

63. The Report was prepared and delivered as part of Vigilant Multifamily's paid services in commerce.

64. Rex Environmental never received any sample from Vigilant Multifamily on July 17, 2026 or on any other date. The samples were actually collected by Vigilant Multifamily on July 15, 2026. Moreover, Mr. Oqueli's July 20, 2026 statements that he had "just reached out to Rex Environmental" and was "waiting to hear back" are false as Rex Environmental received no communication from Mr. Oqueli or Vigilant Multifamily regarding the samples, and has no record of any such contact. Accordingly, the Report's representations that the sample was collected on July 17, 2026, that it was received by Rex Environmental on July 17, 2026 and that it was received "Sealed and Intact," are each false.

65. The Homeowners were concerned about the Report because the Report only mentioned one sample even though three samples were taken.

66. Consequently, the Homeowners reached out to Rex Environmental on July 24, 2026 to confirm that all three samples were tested.

67. Rex Environmental did not have any record of the test and asked the Homeowners to provide the Report and photographs so they could be reviewed by Rex Environmental.

68. After review, Rex Environmental emailed the Homeowners that they did not process the test and did not prepare, approve, or issue the Report.

69. Rex Environmental further informed the Homeowners that the Report contained Rex Environmental's name and logo without their authorization.

70. Additionally, Rex Environmental informed the Homeowners that "Rex Environmental cannot verify whether the samples were analyzed or confirm the accuracy or reliability of the reported findings."

71. On that same day, July 24, 2026, the Third-Party Contractor, based on the Report, completed patching the areas where the samples were taken as the Homeowners had agreed for them to begin the patch work before the Homeowners learned that the Report was not from or authorized by Rex Environmental.

72. Patching the sampled areas resulted in the destruction of the physical evidence, so neither the Homeowners nor Rex Environmental can now verify the ceiling's condition at the time of sampling.

73. On Friday, July 24, 2026 at 5:41 p.m., Homeowner B sent an electronic mail message to jorge@vigilantmf.com, to Mr. Oqueli at jorge@savvymf.com, and to the Third-Party Contractor, stating that Rex Environmental had communicated that it did not create the Report, and quoting Rex Environmental's statement that "[a]fter reviewing our internal records, Rex Environmental was unable to locate any record of the property, inspection, sample submission, or report provided to you."

74. Twelve minutes later, at 5:53 p.m. on July 24, 2026, Mr. Oqueli replied from the address jorge@savvymf.com, recommending that the Homeowners "find a company to do the test" and stating that "Rex Environmental can come out and do it."

75. Vigilant Multifamily thereby received notice, at an electronic mail address on its own domain, that Rex Environmental had disavowed the Report.

76. Vigilant Multifamily had notice of the conduct alleged herein. Rex Environmental provided Vigilant Multifamily with written notice of the conduct alleged herein and of Rex Environmental's claims in August of 2026.

77. Notwithstanding that notice, Vigilant Multifamily continued to maintain for Mr. Oqueli's use the electronic mail accounts on its domains, continued to permit Mr. Oqueli to be held out as associated with Vigilant Multifamily, and failed to identify or notify the recipients of the Report or of any other report bearing Rex Environmental's Logo or name.

78. By the foregoing conduct, Vigilant Multifamily ratified, approved, adopted, and accepted the benefits of Mr. Oqueli's acts as alleged herein, and is liable for those acts.

79. In the further alternative, Vigilant Multifamily continued to supply Mr. Oqueli with the means to engage in the conduct alleged herein, including electronic mail accounts on Vigilant Multifamily's domains, Vigilant Multifamily's name, logo, and branding, and access to Vigilant Multifamily's customers and projects, while knowing or having reason to know that Mr. Oqueli was using those means to infringe Rex Environmental's Logo and name. Vigilant Multifamily is therefore contributorily liable for the infringement alleged herein.

80. Thus, Vigilant Multifamily's Report is not only likely to cause confusion with the Logo of United States Trademark Registration No. 7,066,427, but it has actually caused confusion with the Logo.

81. Vigilant Multifamily was formed in May of 2026 as alleged above and took over the business of Savvy Multifamily LLC.

82. Savvy Multifamily LLC is currently showing a noncompliant status with the Colorado Secretary of State.

83. Vigilant Multifamily has the same individual members as Savvy Multifamily LLC.

84. Savvy Multifamily LLC was sued by Savvy Construction LLC in June of 2025 for infringing upon Savvy Construction LLC's "SAVVY" mark. As part of this dispute, Savvy Multifamily LLC filed its own competing federal trademark registration for SAVVY MULTIFAMILY.

85. As alleged above, less than two months after formation, Vigilant Multifamily has infringed upon and counterfeited Rex Environmental's name and Logo.

86. Vigilant Multifamily and its members had actual knowledge of trademark rights and obligations by virtue of this prior dispute, and thus, Vigilant Multifamily's conduct was willful and undertaken with knowledge that it infringed the Logo of Registration No. 7,066,427. Vigilant's willfulness is further supported by the fictitious analyst on the Report, the fabricated accreditation on the Report, and by its prior trademark dispute, each as alleged above.

87. Mr. Oqueli's conduct was willful, as he knowingly used Rex Environmental's Logo and name without authorization or, in the alternative, acted with reckless disregard for Rex Environmental's rights. Mr. Oqueli's willfulness is further supported by the fictitious analyst and the fabricated accreditation appearing on the face of the Report, and by his statements to the Homeowners that he had contacted Rex Environmental, that he had received the Report from Rex Environmental, and that the Report was from Rex Environmental, each of which was false when made.

88. Rex Environmental has been harmed by Defendants, including from the loss of control over its Logo and the quality it signifies, injury to its goodwill built since 2017, exposure from the false accreditation representation in the Report, and the risk that consumers who relied on a fabricated report attribute the resulting harm to Rex Environmental.

**FIRST CAUSE OF ACTION**

**Counterfeiting – 15 U.S.C. § 1114**

89. Rex Environmental hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

90. As alleged above, Rex Environmental is the owner of United States Trademark Registration No. 7,066,427 for its Logo in connection with "Environmental testing services, namely, mold, asbestos, and lead testing and consulting related thereto."

91. Defendants, in the course of their business, used a logo substantially indistinguishable from Rex Environmental's Logo shown in Registration No. 7,066,427 in commerce in connection with the Report described above without Rex Environmental's consent.

92. Mr. Oqueli personally performed, directed, and participated in the acts alleged in this Cause of Action. Mr. Oqueli personally collected the samples, personally represented to the Homeowners that the samples had been sent to Rex Environmental for testing, personally delivered the Report bearing the counterfeit mark to the Homeowners, and personally represented to the Homeowners that the Report had been prepared and issued by Rex Environmental. Mr. Oqueli was the moving, active, and conscious force behind the use of the counterfeit mark alleged herein and is personally liable for that use, and Vigilant Multifamily is liable for that use as alleged above.

93. The logo on the Report is a counterfeit mark of the Logo of Registration No. 7,066,427, being a spurious mark identical with or substantially indistinguishable from the Logo of Registration No. 7,066,427 as defined by 15 U.S.C. § 1116(d)(1)(B) and 15 U.S.C. § 1127.

94. The Report is a mold analysis report and falls directly within the services of the Registration.

95. Defendants' use of an identical or substantially indistinguishable logo to Rex Environmental's Logo of Registration No. 7,066,427 on its Report is likely to cause confusion as to origin, sponsorship, or approval of the Report.

96. Additionally, Defendants' use of an identical or substantially indistinguishable logo to Rex Environmental's Logo of Registration No. 7,066,427 on its Report has actually caused confusion as the Homeowners believed the Report originated from or was otherwise approved by Rex Environmental and relied on the Report in having their kitchen ceiling repaired.

97. Defendants' counterfeiting use of a logo identical or substantially indistinguishable from the Logo of Registration No. 7,066,427 was willful, as Defendants knowingly used Rex Environmental's Logo without authorization or acted with reckless disregard for Rex Environmental's rights. Defendants' willfulness is further supported by the fictitious analyst and the fabricated accreditation appearing on the face of the Report, and Vigilant Multifamily's willfulness is further supported by its prior trademark dispute, each as alleged above. Mr. Oqueli's willfulness is further supported by his statements to the Homeowners that he had contacted Rex Environmental, that he had received the Report from Rex Environmental, and that the Report was from Rex Environmental, each of which was false when made.

98. This is an exceptional case under 15 U.S.C. § 1117(a).

99. Rex Environmental has been harmed by Defendants' actions from the loss of control over its Logo of Registration No. 7,066,427 and the quality it signifies, injury to its goodwill built since 2017, exposure from the false accreditation representation in the Report, and the risk that consumers who relied on a fabricated report attribute the resulting harm to Rex Environmental.

**SECOND CAUSE OF ACTION**

**Service Mark Infringement – 15 U.S.C. § 1114, in the Alternative**

100. Rex Environmental hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

101. As alleged above, Rex Environmental is the owner of United States Trademark Registration No. 7,066,427 for its Logo in connection with "Environmental testing services, namely, mold, asbestos, and lead testing and consulting related thereto."

102. Defendants, in the course of their business, used a logo likely to cause confusion as to origin, sponsorship, or approval of the Report described above without Rex Environmental's consent.

103. Additionally, Defendants, in the course of their business, used the name "REX Environmental" within the Report, in two separate places, in a manner likely to cause confusion as to origin, sponsorship, or approval of the Report.

104. Mr. Oqueli personally performed, directed, and participated in the acts alleged in this Cause of Action, was the moving, active, and conscious force behind those acts, and is personally liable therefor. Vigilant Multifamily is liable for those acts as alleged above.

105. The Report is a mold analysis report and falls directly within the services of the Registration.

106. Additionally, Defendants' use of the logo and Rex Environmental's name on the Report has actually caused confusion as the Homeowners believed the Report originated from or was otherwise approved by Rex Environmental and relied on the Report in having their kitchen ceiling repaired.

107. Defendants' use of the logo and Rex Environmental's name on the Report was willful as Defendants knowingly used Rex Environmental's Logo without authorization or, in the alternative, acted with reckless disregard for Rex Environmental's rights. Defendants' willfulness

is further supported by the fictitious analyst and the fabricated accreditation appearing on the face of the Report, and Vigilant Multifamily's willfulness is further supported by its prior trademark dispute, each as alleged above. Mr. Oqueli's willfulness is further supported by his statements to the Homeowners that he had contacted Rex Environmental, that he had received the Report from Rex Environmental, and that the Report was from Rex Environmental, each of which was false when made.

108. This is an exceptional case under 15 U.S.C. § 1117(a).

109. Rex Environmental has been harmed by Defendants' actions from the loss of control over its Logo of Registration No. 7,066,427 and the quality it signifies, injury to its goodwill built since 2017, exposure from the false accreditation representation in the Report, and the risk that consumers who relied on a fabricated report attribute the resulting harm to Rex Environmental.

## THIRD CAUSE OF ACTION

### False Association Unfair Competition – 15 U.S.C. § 1125(a)(1)(A)

110. Rex Environmental hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

111. Rex Environmental has gained common law rights in its Logo and name in connection with environmental testing services, namely, mold, asbestos, and lead testing and consulting related thereto.

112. Defendants, in the course of their business, used a logo and Rex Environmental's name on the Report described above in a manner likely to cause confusion as to the affiliation, connection, or association of Defendants with Rex Environmental, or as to the origin, sponsorship, or approval of Defendants' services by Rex Environmental.

113. The Report is a mold analysis report and falls directly within the scope of services offered by Rex Environmental.

114. Additionally, Defendants' use of the logo and Rex Environmental's name on the Report has actually caused confusion as the Homeowners believed the Report originated from or was otherwise approved by Rex Environmental and relied on the Report in having their kitchen ceiling repaired.

115. Furthermore, Defendants falsely designated the origin of the Report by representing that Rex Environmental performed the laboratory analysis, that Rex Environmental received and handled the sample, that a Rex Environmental analyst reviewed and approved the findings, and that Rex Environmental holds ISO/IEC 17025 accreditation. Each of these representations is false.

116. Mr. Oqueli personally performed, directed, and participated in the acts alleged in this Cause of Action, was the moving, active, and conscious force behind those acts, and is personally liable therefor. Vigilant Multifamily is liable for those acts as alleged above.

117. Defendants' use of the logo and Rex Environmental's name on the Report was willful, as Defendants knowingly used these items without authorization or, in the alternative, acted with reckless disregard for Rex Environmental's rights. Defendants' willfulness is further supported by the fictitious analyst and the fabricated accreditation appearing on the face of the Report, and Vigilant Multifamily's willfulness is further supported by its prior trademark dispute, each as alleged above. Mr. Oqueli's willfulness is further supported by his statements to the Homeowners that he had contacted Rex Environmental, that he had received the Report from Rex Environmental, and that the Report was from Rex Environmental, each of which was false when made.

118. This is an exceptional case under 15 U.S.C. § 1117(a).

119. Rex Environmental has received injury to a commercial interest in reputation or sales, proximately caused by Defendants' conduct. Specifically, Defendants' actions resulted in Rex Environmental's loss of control over its common law rights and the quality those rights signify, injury to its goodwill built since 2017, exposure from the false accreditation representation in the Report, and the risk that consumers who relied on a fabricated report attribute the resulting harm to Rex Environmental.

**FOURTH CAUSE OF ACTION**

**Violation of the Colorado Consumer Protection Act – C.R.S. § 6-1-101, et seq.**

120. Rex Environmental hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

121. Each Defendant is a person within the meaning of C.R.S. § 6-1-102(6).

122. At all relevant times, Defendants were engaged in the business of providing mitigation, restoration, general contracting, and investigation and consulting services to consumers in Colorado. Mr. Oqueli was engaged in that business as Vigilant Multifamily's employee or agent and in the course of his own occupation.

123. In the course of that business, Defendants engaged in deceptive trade practices within the meaning of C.R.S. § 6-1-105(1), including:

a. knowingly or recklessly making false representations as to their affiliation, connection or association with Rex Environmental, in violation of C.R.S. § 6-1-105(1)(c), by delivering to the Homeowners a Report bearing Rex Environmental's Logo and name and representing that Rex Environmental performed, received, analyzed, and approved the laboratory analysis described therein;

b. knowingly or recklessly making false representations as to the source, sponsorship, approval, characteristics, uses, and benefits of their services, in violation of C.R.S. § 6-1-105(1)(e), by representing that the mold analysis had been performed by an accredited laboratory when no such analysis was performed;

c. representing that their services are of a particular standard, quality, or grade when Defendants knew or should have known that they were of another, in violation of C.R.S. § 6-1-105(1)(g), by representing that the sample was analyzed under ISO/IEC 17025 accreditation and by a credentialed environmental analyst, when no such analysis, accreditation, or review occurred; and

d. knowingly or recklessly making false or misleading statements of fact concerning the services offered, in violation of C.R.S. § 6-1-105(1)(e), including the false dates of collection and receipt, the false representation that the sample was received "Sealed and Intact," and the fabricated laboratory results and interpretation.

124. The Report was fabricated. As alleged above, no sample was ever delivered to Rex Environmental, no analysis was performed by Rex Environmental, the individual identified as having approved the Report has never been employed by Rex Environmental, and the accreditation attributed to Rex Environmental does not exist.

125. Mr. Oqueli personally performed, directed, and participated in the deceptive trade practices alleged in this Cause of Action, and engaged in those practices in the course of his own business, vocation, and occupation. Mr. Oqueli is personally liable for those practices, and Vigilant Multifamily is liable for those practices as alleged above.

126. Defendants' deceptive trade practices occurred in the course of their business, vocations, and occupations, and were directed to consumers in the market for mold assessment and remediation services.

127. Defendants' deceptive trade practices significantly impact the public as actual or potential consumers of Defendants' services. The practice of delivering a fabricated environmental laboratory report to a consumer is not incident to any private dispute between Rex Environmental and Vigilant Multifamily. It arose in the ordinary course of Defendants' provision of restoration and remediation services to residential consumers, and it is a practice available to Defendants in connection with every consumer engagement in which environmental testing is requested.

128. The consumers directly affected here, the Homeowners, are members of the general public who engaged a contractor for residential renovation work and sought assurance that their home was free of mold. Defendants' services are marketed and available to the public generally, and any consumer of those services is subject to the same practice.

129. The deceptive trade practices alleged concern matters of health and safety. A fabricated Report falsely stating that no water-damage indicator fungi were present in a water-damaged residential ceiling has the capacity to cause consumers to forgo remediation of a genuine mold condition in their homes. As alleged above, the Homeowners permitted the sampled areas to be patched and closed in reliance on the Report, destroying the physical evidence and foreclosing verification of the ceiling's condition.

130. Defendants' deceptive trade practices caused injury to Rex Environmental's legally protected interests, including its rights in its Logo and name, its goodwill and business reputation, and its interest in controlling the quality of services and reports issued under its name. Rex Environmental has been further injured by exposure arising from the false representation that it

holds ISO/IEC 17025 accreditation, and by the risk that consumers who relied on the fabricated Report will attribute the resulting harm to Rex Environmental.

131. Defendants engaged in the conduct alleged above in bad faith, knowing the Report was fabricated and that Rex Environmental had neither performed nor authorized the analysis described in it. Defendants' bad faith is further supported by the fictitious analyst and the fabricated accreditation appearing on the face of the Report, and Vigilant Multifamily's bad faith is further supported by its prior trademark dispute, each as alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Rex Environmental LLC respectfully requests that this Court enter judgment in its favor and against Defendants, and grant the following relief:

### A. Declaratory Relief

1. A declaration that United States Trademark Registration No. 7,066,427 is valid and that Plaintiff is the owner thereof;
2. A declaration that Defendants' use of the mark appearing on the Report constitutes use of a counterfeit mark within the meaning of 15 U.S.C. § 1116(d)(1)(B);
3. A declaration that Defendants' conduct was willful and that this is an exceptional case within the meaning of 15 U.S.C. § 1117(a);

### B. Injunctive Relief

4. A permanent injunction under 15 U.S.C. § 1116(a) enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from:
   a. Using the Logo of Registration No. 7,066,427, or any mark confusingly similar thereto, in connection with any goods or services;

b. Using the name "Rex Environmental" or any confusingly similar designation in connection with any goods or services;

c. Representing, directly or by implication, that Rex Environmental performed, received, analyzed, approved, or issued any report, analysis, or testing;

d. Representing that Rex Environmental holds any laboratory accreditation, including ISO/IEC 17025 accreditation; and

e. Otherwise engaging in any conduct likely to cause confusion as to the affiliation, connection, or association of Defendants with Plaintiff, or as to the origin, sponsorship, or approval of Defendants' services;

5. An order under 15 U.S.C. § 1118 requiring Defendants to deliver up for destruction all copies of the Report and all other materials in their possession, custody, or control bearing the Logo of Registration No. 7,066,427 or the name "Rex Environmental";

6. An order requiring Defendants to identify in writing each person or entity to whom they provided the Report or any other report bearing the Logo of Registration No. 7,066,427 or the name "Rex Environmental," and to notify each such person or entity in writing that the report was not prepared, issued, approved, or authorized by Rex Environmental;

7. An order under 15 U.S.C. § 1116(a) requiring Defendants to file with the Court and serve upon Plaintiff, within thirty days after entry of the injunction, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

**C. Monetary Relief – First Cause of Action**

8. Plaintiff's actual damages, including damages for corrective advertising, and Defendants' profits, under 15 U.S.C. § 1117(a) and (b);

9. That the award of damages or profits, whichever is greater, be trebled under 15 U.S.C. § 1117(b), together with prejudgment interest;

10. In the alternative to paragraphs 8 and 9, and at Plaintiff's election at any time before final judgment, statutory damages under 15 U.S.C. § 1117(c) in an amount up to $200,000.00 per counterfeit mark per type of services, or up to $2,000,000.00 per counterfeit mark per type of services for willful use;

**D. Monetary Relief – Second and Third Causes of Action**

11. Plaintiff's actual damages, including damages for corrective advertising, and Defendants' profits, under 15 U.S.C. § 1117(a);

12. That the Court enter judgment for a sum above the amount found as actual damages, not exceeding three times such amount, as the Court shall find to be just according to the circumstances of the case, under 15 U.S.C. § 1117(a);

**E. Monetary Relief – Fourth Cause of Action**

13. Plaintiff's actual damages under C.R.S. § 6-1-113(2)(a);

14. Treble damages for Defendants' bad faith conduct under C.R.S. § 6-1-113(2)(a)(III);

15. Plaintiff's costs and reasonable attorney fees under C.R.S. § 6-1-113(2)(b);

**F. Additional Relief**

16. Plaintiff's reasonable attorney fees and costs under 15 U.S.C. § 1117(a) and (b);

17. Pre-judgment and post-judgment interest at the maximum rate allowed by law;

18. Plaintiff's costs of the suit; and

19. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated this 10th day of November 2026

**Sam IP Legal Solutions, P.C.**

By */s/ Ryan D. Sam*
Ryan D. Sam, Registration No. 55650
*Attorney for Plaintiff*